[Cite as *State v. Acosta*, 2022-Ohio-3327.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 111110 |
| v. | : | |
| JONATHAN ACOSTA, | : | |
| Defendant-Appellee. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** September 22, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-14-582384-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Anthony Thomas Miranda and Callista Plemel, Assistant Prosecuting Attorneys, *for appellant.*

Kimberly Kendall Corral, *for appellee.*

FRANK DANIEL CELEBREZZE, III, J.:

{¶ 1} Appellant state of Ohio ("state") appeals the judgment of the Cuyahoga County Court of Common Pleas, granting appellee Jonathan Acosta's ("Acosta") motion to withdraw guilty plea. After a thorough review of the applicable law and facts, we reverse the judgment of the trial court.

# I. Factual and Procedural History

{¶ 2} In 2014, Acosta was indicted on the following charges: aggravated murder, in violation of R.C. 2903.01(A), an unclassified felony; two counts of murder, in violation of R.C. 2903.02(A) and 2903.03(B), unclassified felonies; three counts of felonious assault, in violation of R.C. 2903.11(A)(1) and 2903.11(A)(2), felonies of the second degree; one count of tampering with evidence, in violation of R.C. 2921.12(A)(1), a felony of the third degree; and one count of abuse of a corpse, in violation of R.C. 2927.01(A), a misdemeanor of the second degree.

{¶ 3} The charges stemmed from the 2014 murder of Alexavier Gonzalez ("Gonzalez"). Acosta, who was 17 years old at the time, provided the following facts to police.

{¶ 4} On the day of Gonzalez's murder, Acosta and Gonzalez played video games at Acosta's residence. While they played, Gonzalez made "concerning" statements to Acosta about who he could trust.

{¶ 5} Acosta had a fishing knife that he kept in a sheath on his bedroom dresser and realized at some point that Gonzalez had taken it. Gonzalez told Acosta he was going to kill him and stabbed Acosta in his right leg. Acosta grabbed a baseball bat, and when Gonzalez attacked him again, Acosta hit Gonzalez in the head with the bat.

{¶ 6} Acosta ran out of the room, and Gonzalez ran after him again. Acosta hit Gonzalez with the bat again, which caused Gonzalez to drop the knife. Acosta grabbed the knife and stabbed Gonzalez in the neck. Acosta ran away to the

bathroom, and Gonzalez continued to come after him. In the bathroom, Gonzalez attempted to attack Acosta again and Acosta hit him with the baseball bat. Gonzalez fell into the tub. He was still moving, so Acosta stabbed him in the back.

{¶ 7} Acosta then proceeded to clean up the scene. He pulled Gonzalez out of the tub and put his body into garbage bags. He tied up the body and dragged it downstairs to the back door of the residence. He went outside to look for a garbage can. He found one and brought it to the back door of the residence. He put Gonzalez's body into the can, headfirst. Acosta then dragged the garbage can into the alley where he left it. He returned to his residence and placed his knife back into the sheath on his dresser.

{¶ 8} Acosta then changed his clothes and began cleaning up the blood. While doing so, his father arrived home. He told his father that his friend had gone crazy and stabbed him, so Acosta had to kill him. Acosta's father called 911.

{¶ 9} Acosta was taken to the hospital for the stab wound on his leg. When he was released, he was transported to the police station. During his interview with police, Acosta admitted that another person, David Rivera, was present at the time of Gonzalez's death. Acosta then told the following slightly different version of events.

{¶ 10} Acosta was playing video games with Gonzalez and Rivera in his room. Acosta left the room momentarily and upon his return, Gonzalez was upset that Rivera beat him in a game, and he stabbed Acosta. He stated that Rivera was the one who found the garbage can used for Gonzalez's body.

{¶ 11} Police went to Rivera's home and arrested him. He was interviewed by a detective and gave both an oral and written statement. In his statements, he stated that he received a text message from Acosta asking Rivera to call him. When Rivera called him, Acosta told Rivera that he wanted to kill someone who had insulted and stolen from him. Rivera believed Acosta to be joking and went to his residence where Gonzalez and Acosta were hanging out in Acosta's room.

{¶ 12} Gonzalez took a shower while Rivera and Acosta played video games. When Gonzalez came out of the shower, Rivera and Acosta were playing a game he did not know. Rivera gave Gonzalez the controller to play the game while he and Acosta watched.

{¶ 13} Rivera stated that he suddenly saw Acosta swing his arm downward toward Gonzalez. Rivera observed a knife in Acosta's hand and a stab wound on Gonzalez's neck. Gonzalez began yelling and tried to get away by running downstairs. Acosta then threatened to kill Rivera if he did not help him kill Gonzalez. Rivera said that he did not want to be involved, and Acosta left the bedroom.

{¶ 14} Rivera heard yelling downstairs, then Gonzalez came back upstairs and asked Rivera to call his family. Acosta returned upstairs, and Rivera saw Acosta hit Gonzalez on top of the head with a baseball bat. Gonzalez fell to the floor and Acosta continued to beat him in the head with the bat. Rivera heard Gonzalez either crawling or Acosta dragging him to the bathroom. A short while later, Acosta came back into the bedroom where Rivera had stayed. He threatened to kill Rivera again

if he did not help Acosta clean up. Rivera retrieved cleaning products and went to the kitchen. He observed blood on the floor and the sink. He also observed another knife on the counter. He cleaned up the blood in the kitchen and some in the living room.

{¶ 15} Rivera then heard Acosta dragging Gonzalez's body down the stairs. It was wrapped in multiple trash bags, but Rivera could still see portions of his body. Acosta dragged Gonzalez's body to the back door where Rivera saw a garbage can. Acosta told Rivera to hold the garbage can while he put Gonzalez's body inside. Rivera complied, and Acosta put Gonzalez's body in headfirst with his feet and some of his legs sticking out of the top. Acosta and Rivera then carried the garbage can to a nearby alley. Acosta stated that while carrying the can, Rivera pretended to fall and hurt his foot.

{¶ 16} Acosta then told Rivera to leave but threatened to hurt him if Rivera told anyone what had happened. As he left, Rivera observed that Acosta had dragged the can down the alley across West 35th Street.

{¶ 17} Rivera went home, put his clothes in the laundry, and took a shower. He did not tell anyone what had happened. He told police that he had only assisted because he was afraid of what Acosta would do to him if he did not participate. He further told police that Acosta had not been injured in the confrontation and did not show any signs that he was injured afterward. The wound to Acosta's calf was a superficial wound that police believed was self-inflicted.

{¶ 18} Acosta later pled guilty to aggravated murder and abuse of a corpse, and the remaining counts were dismissed. Acosta was sentenced to 25 years to life in prison in the aggravated murder count and nine months on the abuse of a corpse count, to run concurrently. He did not file a direct appeal.

{¶ 19} In 2021, Acosta filed a motion to withdraw guilty plea based upon newly discovered evidence. His motion presented the affidavit of Rivera, which contradicted the statements Rivera had made to police at the time of the crime.

{¶ 20} Rivera testified at the hearing on the motion. He was represented by counsel, and prior to his testimony, the court inquired as to whether he understood his rights regarding self-incrimination. Rivera testified that he wanted to make a new statement because he had falsified his original statement due to his belief that Acosta was "trying to throw [him] under the bus." He further stated that he (along with Acosta and Gonzalez) had been on LSD on the day that Gonzalez was killed and that he was scared.

{¶ 21} Rivera testified that the day after Gonzalez was killed, officers came to his house and told him that he was under arrest for Gonzalez's murder. He further stated that a female officer said something like, "I heard you killed somebody." Rivera stated that he asked for an attorney when he was brought down to the station, but the officers "advised against it" because it would slow down the booking process.

{¶ 22} Rivera stated that later a detective said to him, "I heard your friend's trying to throw you under the bus." Rivera believed the detective and testified that he thought that implicating Acosta would help him. Rivera was 15 or 16 years old at

the time and did not think that police were allowed to lie to minors in order to obtain a statement. He also testified that, at the time of the interview, he believed he was still experiencing the effects of consuming LSD.

{¶ 23} Rivera further testified that when he was read his Miranda rights, the detectives did not ensure that he understood them and did not ask him if he wanted an attorney or a parent or guardian present.

{¶ 24} Sometime after Acosta pled guilty in this matter, Rivera took a job working for Acosta's father, Edgar. Edgar did not want to discuss the case with Rivera but helped him find an attorney. Rivera testified that he was not required to say anything specific for Edgar to help him get the attorney and that he used his own money to pay for the attorney.

{¶ 25} Rivera then testified as to what occurred on the day of Gonzalez's murder. He stated that Gonzalez became angry when he saw a picture on Acosta's phone of a young lady baring her breasts. He angrily asked Acosta who she was, and Acosta responded that it was his girlfriend. Rivera stated that Gonzalez did not like that and began swinging at Acosta.

{¶ 26} When asked what Gonzalez was angry about, Rivera stated that he believed that Acosta and Gonzalez had "tried some things" to establish if they were bisexual. Rivera stated that Acosta had determined that he did not like males and was only attracted to females but that he wanted to keep his friendship with Gonzalez. Rivera believed that Gonzalez was jealous of Acosta's girlfriend.

{¶ 27} Acosta and Gonzalez continued to tussle; Rivera then heard a scream. Gonzalez hopped up holding his neck and ran downstairs. Acosta then said he was sorry and went after Gonzalez. Acosta came back up and asked Rivera to help him.

{¶ 28} Gonzalez returned upstairs, yelling, "I'm going to f***ing kill you." He told Rivera, "[y]ou got to call my family." At this point, Gonzalez had a knife, and Acosta had a baseball bat. Acosta hit Gonzalez with the bat when he got to the top of the stairs. Rivera testified that Gonzalez could have left while he was downstairs, but he came back up and was aggressive toward Acosta.

{¶ 29} Acosta began hitting Gonzalez with the bat, and Gonzalez's body hit the floor. Rivera stated that he believed this was when Acosta sustained the stab wound to his leg. He did not see it occur but later learned that Acosta had been stabbed.

{¶ 30} At this point, Gonzalez was struggling to breathe, and the back of his skull was open. Rivera stated that Acosta wanted to end his suffering and tried to hit him again.

{¶ 31} Rivera then testified as to how he helped move Gonzalez's body to the bathroom, clean up, and attempt to put Gonzalez's body in the trash can. Rivera stated that he purposely slipped on some ice to get injured so he would not have to help carry Gonzalez's body.

{¶ 32} Rivera stated that his grandmother, with whom he lived, was the first person he told the true story of what had happened, but it was not until approximately three years later. He stated that he told Acosta's father

approximately five years prior to the hearing. He also told Acosta's trial counsel, Kimberly Kendall Corral, one and one-half to two years ago. Ms. Corral drafted an affidavit for him.

{¶ 33} Rivera was charged with gross abuse of a corpse, tampering with evidence, and obstruction of official business. He denied that he reviewed any police reports during the pendency of his case and stated he did not know whether Acosta had actually ever made a statement to police implicating him.

{¶ 34} The video of Rivera's initial interview was played for the court. The video did not reflect any statement by the detective that Acosta was trying to throw Rivera under the bus. Counsel for the state asked when the detective made this statement, and Rivera said it occurred before they entered the interrogation room.

{¶ 35} Acosta also testified at the motion hearing, with questions limited to why he had pled guilty in this matter. He testified that Rivera's statement was a "big part" of his decision because he was the only other person present. He stated that he would not have pled guilty to aggravated murder if Rivera had not made a false statement against him.

{¶ 36} On cross-examination, Acosta admitted that his two attorneys counseled him that the plea was the best option and that they did not think that his testimony would overcome Rivera's statements. He stated that prior to pleading, he spoke with his attorneys about the evidence the state possessed and had a conversation with the court about his rights.

{¶ 37} The state played an audio recording of a jail phone call that Acosta made to a friend. During the call, he stated that his goal in moving to withdraw his guilty plea was to reduce his charge to manslaughter, which would not have a life tail to the sentence and would not be subject to review by the parole board.

{¶ 38} Detective Raymond Diaz, who interviewed Rivera, also testified. He stated that Rivera did not have any difficulty understanding the questions asked and did not ask for an attorney or parent to be present. He stated that in 2014, at the time of Rivera's interview, the police department did not have a policy that a parent be present during the interview of a minor.

{¶ 39} The trial court granted Acosta's motion, finding:

After viewing Mr. Rivera's new testimony with the "utmost suspicion" the court finds Mr. Rivera's October 26, 2021 testimony and recantation of his prior statements to be credible and persuasive. Therefore, the court finds reliance upon such false testimony presents a fundamental flaw in the path of justice and the defendant could not have sought redress from the resulting prejudice through another form of application reasonably available to him.

{¶ 40} The state then filed the instant appeal, raising two assignments of error for our review:

I. A guilty plea that is entered into knowingly, voluntarily, and intelligently cannot be withdrawn based on claims of innocence or newly discovered evidence.

II. A trial court abuses its discretion in granting a motion to withdraw guilty plea due solely to recanting testimony from a co-defendant where the trial court ignores evidence affecting the recantation's credibility.

## II. Law and Analysis

{¶ 41} In its first assignment of error, the state essentially argues that the trial court erred in allowing Acosta to withdraw his guilty plea based upon newly discovered evidence.

{¶ 42} In his amended motion to withdraw guilty plea, Acosta argued that newly discovered evidence in the form of Rivera's recantation demonstrates that a manifest injustice occurred in which he could not have entered his plea knowingly, voluntarily, or intelligently. Acosta maintains that he acted in self-defense in Gonzalez's death, and the only evidence contradicting this was Rivera's statement to police, which Rivera now says he made solely due to misrepresentations by the officers interviewing him.

{¶ 43} We review a trial court's decision regarding a defendant's postsentence motion to withdraw a guilty plea under an abuse-of-discretion standard. *State v. Simmons*, 8th Dist. Cuyahoga No. 109786, 2021-Ohio-1656, ¶ 19. An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Such an abuse """implies that the court's attitude is unreasonable, arbitrary or unconscionable.""" *State v. Montgomery*, Slip Opinion No. 2022-Ohio-2211, ¶ 135, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 44} A motion to withdraw a guilty plea is governed by Crim.R. 32.1. This rule provides: "A motion to withdraw a plea of guilty * * * may be made only before sentence is imposed; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his or her plea." "The defendant bears the burden of establishing the existence of 'manifest injustice.'" *State v. Hobbs*, 8th Dist. Cuyahoga No. 109706, 2021-Ohio-852, ¶ 6, citing *State v. Smith*, 49 Ohio St.2d 261, 361 N.E.2d 1324 (1977), paragraph one of the syllabus. "Manifest injustice is 'a clear or openly unjust act,'" "that is evidenced by 'an extraordinary and fundamental flaw in the plea proceeding.'" *Simmons* at ¶ 20, quoting *State ex rel. Schneider v. Kreiner*, 83 Ohio St.3d 203, 208, 699 N.E.2d 83 (1998); *State v. McElroy*, 8th Dist. Cuyahoga Nos. 104639, 104640, and 104641, 2017-Ohio-1049, ¶ 30.

{¶ 45} Acosta contends that the affidavit and testimony from Rivera, recanting his statement to police, is sufficient to demonstrate manifest injustice in his plea proceeding. We disagree. In his motion, Acosta asserted that because of Rivera's recantation, the state would not have any evidence of prior calculation or design to be able to convict him of aggravated murder. He contends that he could only be charged with murder, and he would have proceeded to trial and claimed self-defense. However, Acosta's claim that he is innocent of aggravated murder is not sufficient grounds to vacate a plea that was knowingly, intelligently, and voluntarily entered. *See State v. Heisa*, 8th Dist. Cuyahoga No. 101877, 2015-Ohio-2269, citing

*State v. Minifee*, 8th Dist. Cuyahoga No. 99202, 2013-Ohio-3146; *State v. Bloom*, 8th Dist. Cuyahoga No. 97535, 2012-Ohio-3805.

{¶ 46} We note that Acosta has not asserted that he was innocent of aggravated murder until now. "A defendant who has entered a guilty plea without asserting actual innocence is presumed to understand that he has completely admitted his guilt." *State v. Linder*, 8th Dist. Cuyahoga No. 99350, 2013-Ohio-5018, ¶ 16, citing *State v. Griggs*, 103 Ohio St.3d 85, 2004-Ohio-4415, 814 N.E.2d 51, syllabus.

{¶ 47} As noted by the state, Acosta had knowledge of what occurred on the day that Gonzalez was killed and therefore would have known if Rivera's statements were true or false. Yet he still entered a guilty plea to aggravated murder, thereby completely admitting his guilt. "[A] counseled plea of guilty to a charge removes the issue of factual guilt from the case." *State v. Zimmer*, 8th Dist. Cuyahoga No. 90846, 2008-Ohio-6953, ¶ 23, citing *State v. Stumpf*, 32 Ohio St.3d 95, 104-105, 512 N.E.2d 598 (1987); *State v. Woodley*, 8th Dist. Cuyahoga No. 83104, 2005-Ohio-4810, ¶ 12.

{¶ 48} The record reflects that Acosta received a full Crim.R. 11 hearing where the trial court engaged in a thorough colloquy with Acosta, informing him of each of the rights he was giving up and ensuring that he understood the same. Acosta does not argue otherwise.

{¶ 49} In analyzing Acosta's motion, the trial court weighed Rivera's age when giving his statement to police, the fact that he was without an attorney or parent/guardian, and the fact that he was under the mistaken belief that Acosta was

going to blame him for Gonzalez's death. However, these circumstances all existed at the time of Acosta's plea. While it was unknown that Rivera would later recant, any issues with the police interview of Rivera and his statement could have been explored during the pendency of Acosta's case.

{¶ 50} Moreover, throughout the plea process, appellant was represented by two experienced and competent counsel. During the plea hearing, his counsel stated that, in their professional opinion, they believed that his plea would be knowing, voluntary, and intelligently of his own free will. Acosta does not argue that he did not receive effective assistance of counsel with regard to his plea. When questioned by the court, Acosta stated he was satisfied with the services provided by his attorneys and that they had done everything that he asked them to do.

{¶ 51} Consequently, Acosta has failed to demonstrate anything occurring in the plea proceeding that caused his plea to not be knowing, intelligent, and voluntary. Because Acosta has not demonstrated manifest injustice in the plea proceeding, the trial court abused its discretion in granting his motion.[1] The state's first assignment of error is sustained.

---

[1] We acknowledge that our strict analysis of Crim.R. 32.1 motions that are based upon assertions of innocence coupled with claims of newly discovered evidence conflicts with a number of other appellate districts and places us in the minority. *See State v. Gabbard*, 12th Dist. Clermont No. CA2006-03-025, 2007-Ohio-461 (created test for motion to withdraw based on newly discovered evidence); *State v. West*, 2017-Ohio-5596, 93 N.E.3d 1221, ¶ 19 (1st Dist.) ("Relief upon a claim of actual innocence based on outside evidence may not be granted under the postconviction statutes, * * * but may be had under Crim.R. 33(A)(6) and 32.1."); *State v. Pudder*, 11th Dist. Portage No. 2013-P-0045, 2014-Ohio-68 (noting that presentation of evidence supporting a defense inclines the analysis in favor of withdrawal); *see also State v. Gaughan*, 6th Dist. Lucas No. L-19-1084, 2020-

{¶ 52} In the state's second assignment of error, it argues that the trial court abused its discretion when it granted the motion to withdraw guilty plea while ignoring evidence affecting Rivera's credibility. Since we have sustained the state's first assignment of error, this issue has been rendered moot.

### III. Conclusion

{¶ 53} Because Acosta failed to demonstrate manifest injustice in the plea proceeding, the trial court erred in granting his motion to withdraw guilty plea. The state's first assignment of error is sustained, and the decision of the trial court is reversed.

{¶ 54} This cause is reversed and remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, JUDGE

EILEEN T. GALLAGHER, J., CONCURS;
ANITA LASTER MAYS, P.J., CONCURS IN JUDGMENT ONLY

_____

Ohio-4092; *State v. Van Dyke*, 9th Dist. Lorain No. 02CA008204, 2003-Ohio-4788. However, we decline to deviate from the established precedent of this court.