[Cite as *In re C.V.*, 2023-Ohio-223.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

IN RE C.V., ET AL.                    :

                                      :          No. 111765

[Appeal by Mother, C.V.]              :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 26, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-19-904487, AD-19-904488, AD-19-904489, AD-19-904490,
AD-19-904491, AD-19-904492 and AD-19-904493

---

### *Appearances:*

Wargo Law, LLC, and Leslie E. Wargo, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Andrew Pappert, Assistant Prosecuting Attorney, *for appellee.*

ANITA LASTER MAYS, A.J.:

{¶ 1} Appellant C.V. ("Mother") appeals the juvenile court's termination of her parental rights to her minor children J.V., A.V., I.V., E.V., F.V., and Ja.V., as well as a planned living arrangement for C.V. ("the children"), and the permanent award

of custody to the Cuyahoga County Department of Children and Family Services ("CCDCFS").[1] We affirm the judgment of the trial court.

{¶ 2} On April 15, 2019, CCDCFS filed a complaint alleging neglect and dependency and requested temporary custody of the children. On the same day, the court granted CCDCFS emergency custody of the children.

{¶ 3} On June 18, 2020, after a hearing to extend temporary custody the children, both Mother and Father, along with CCDCFS, agreed that temporary custody be extended. On September 24, 2020, CCDCFS filed a motion to modify temporary custody to permanent custody. The matter was continued on October 22, and November 20, 2020.

{¶ 4} On January 14, 2021, a pretrial hearing was held and Mother was advised of her rights and waived reading of the motion. Upon agreement of all the parties, the matter was continued on January 28, March 11, April 26, May 10, and June 28, 2021. On August 25, 2021, a trial date was set. However, on November 1, and December 6, 2021, the trial was continued. After a series of continuances, trial was set for May 31, 2022. Mother filed for another continuance on May 23, 2022, and the trial court denied Mother's motion.

---

[1] Father is not appealing the trial court's permanency decision of the children.

{¶ 5} On May 31, 2022, the trial court terminated Mother's and Father's parental rights, and placed the eldest child, C.V., in a planned permanent living arrangement and the younger six children in the permanent custody of CCDCFS.

## I. Facts and Procedural History

{¶ 6} Mother and Father shared custody of the children, however, Father was the residential parent. According to the complaint filed by CCDCFS on April 15, 2019, Father was hospitalized on April 3, 2019, and was then discharged to a nursing home, which rendered him unable to care for the children. While Father was hospitalized, mother was supposed to care for the children, but was inconsistent due to her untreated mental health issues, including bipolar disorder and depression. On April 12, 2019, the children were removed from Father's home and committed to the custody of CCDCFS. The children were placed in the temporary custody of CCDCFS on July 29, 2019, and have been in the custody of CCDCFS since that date.

{¶ 7} On May 31, 2022, at the beginning of the trial, Mother requested a continuance because she was having telephone issues and was unable to return her attorney's text messages or telephone calls. Additionally, Father's attorney also requested a continuance because Father was unable to attend trial due to being in a nursing home. CCDCFS opposed both requests for continuances, stating:

> Starting with father, the amputation was actually several years ago. He is in a nursing home, however, the nursing home has been willing to provide transportation for him as long as he requests it.
>
> To my knowledge, he just simply has not requested it for today's trial.

In regard to mother, I'm not sure what the exact documentation is that she would provide and how it would make a difference.

This permanent custody motion has been pending for over a year and a half. The children were removed over three years ago.

And at this time, mother is only residing — she doesn't even have her own housing. She is residing with someone else in a one-bedroom house. She hasn't had housing for three years. And in addition to compliance with the other [sic] of her case plan, I don't see how any documentation she might be able to obtain in the next couple of weeks would change this matter.

(Tr. 6-7.)

{¶ 8} The trial court denied Mother's and Father's motion and stated:

This matter has been continued multiple times already. These children have been in the custody of the Agency for more than three years.

I am not continuing this any longer.

Moreover, I think I had mentioned in the motion — strike that — in the Court's order denying the motion for a continuance that whatever documentation you had, you could bring it to court on today.

And apparently, you did not do that.

Moreover, you've had a sufficient amount of time to provide that documentation to counsel well before today's date. In light of the fact that this trial has been continued at least three times.

So, no, we are not going a day beyond this afternoon in terms of making a decision regarding the Agency's motion.

So that motion to continue beyond today is denied.

(Tr. 7-8.)

### A. Social Worker Stover's Testimony

{¶ 9} At the trial, Amanda Stover ("Stover"), an extended services supervisor with CCDCFS testified that

> [t]he Agency filed for permanent custody due to the concerns that brought the children into care not being remedied. There were still concerns with mother's mental health at the time. There were concerns with father's physical health and his inability to provide for the children. There were concerns with both mother and father's lack of housing. And there were also concerns with their inability to meet the basic needs of the children.

(Tr. 18.)

{¶ 10} Stover specifically testified that Father was diagnosed with diabetes and had failed to manage it. Father was in and out of a nursing home and had both legs amputated. Mother did not have stable housing and would visit the children while they lived with Father. However, Father had a two-bedroom home and was living with a roommate, which made his housing inappropriate for seven children. CCDCFS referred Father to Eden Housing services to attempt to get suitable housing for himself and the children, but Father was unable due to his medical issues and returning to the nursing home.

{¶ 11} Stover also testified that mental health was a concern for both parents. Father was previously engaged in mental health services, but had to stop due to his physical health. Mother was referred to mental health services. Mother engaged in those services and was initially coming to Father's home to help care for the children. However, Mother stop visiting the children at Father's home and instead was taking them to where she was staying. This was a concern to CCDCFS

because the children were staying in an unapproved, unknown location. Many of the children were also not receiving their medication while staying with Mother. As a result, CCDCFS recommended supervised visitations with Mother.

{¶ 12} During cross-examination, Stover testified that she transferred the case in July 2021 and has not had any contact with the family since that time. Stover also testified that Mother was compliant with taking her medications and participating in counseling services through Recovery Resources. Stover stated that towards the end of her supervision of the case there were some concerns that Mother had stopped taking her medications.

**B.    Social Worker Keener's Testimony**

{¶ 13} After Stover's testimony, Crystal Keener ("Keener"), an extended social worker that is currently assigned to the case, testified that she was assigned to the case in July 2021. Keener stated that after investigating the current situation with the children and the parents, "it was found that things that were going on at the overnights were not appropriate." (Tr. 36.) Keener further testified that:

> So what I had learned — First off, the rules were the overnights were supposed to be happening in dad's home and mom was supposed to be there, and the kids were not to leave, not to go to anyone else's homes. The overnights were supposed to remain in the home.
>
> After that, I found out that the kids were being removed from the home at times. At times mom wasn't there — wasn't there 24/7 at the overnights when she was supposed to. Other people were around the children, as well, at the overnights that weren't supposed to be there.
>
> * * *

> During the overnights, from what I learned from the children, were the children were taking care of their father, admini — administering their med — his medication. He is on insulin because he is diabetic.

(Tr. 38-39.)

**{¶ 14}** Keener further testified that she was concerned that the children were responsible for taking care of Father instead of Mother and Father taking care of the children. Keener was also concerned about the people around the children, and stated, "[t]here was a lot of things that were occurring that weren't looked into, and once I looked into it, it felt that it was a safety concern for the children, ultimately, and people that were being around at the visits, as well." (Tr. 42.) Keener informed the children that they were no longer allowed to visit Father and Mother without supervision.

**{¶ 15}** Keener was responsible for taking the children to visit Father in his home. However, she testified that the supervised visitation at Father's home did not work out. She testified that she asked Father to wait for her and the children downstairs, outside of his home. However, when she arrived with the children, Father was not outside and instead provided Keener with the code to come into the house. Keener stated that when she unlocked the door, two of the children immediately ran into the house because they were excited to see Father. However, the children came back downstairs about 30 seconds later. Keener further stated:

> The children then returned downstairs within 30 seconds and said — this is exactly what they said — dad had pooped all over the house.

> So I asked the kids to please stay downstairs with me, and I told dad I would give him 15 minutes to get the home appropriate because we couldn't have the visit upstairs if there was feces all over.
>
> And 15 minutes went by. I checked in with dad again. Dad stated that he was still cleaning up.
>
> At that point, [E.V.] had ran back upstairs. I was not able to stop him. And he assisted with cleaning up dad's mess. That's when I asked [E.V.] to please come downstairs because that was not his job and he should not be put in that position to clean up after his father.
>
> Forty-five minutes had gone by and I told dad that we could no longer wait outside, that we did need to leave the premises and we could reschedule a visit.
>
> Dad did get very upset, started yelling, started throwing things upstairs, and that's when we departed.

(Tr. 45-46.)

{¶ 16} After that incident, Keener testified that she and the children never returned to Father's home and instead met him at a nearby park for visits. Keener stated that Mother was more consistent with the visits in the park because of Father's mobility issues. CCDCFS offered Father assistance in finding a home health aide, but Father denied their assistance. Keener testified that once the weather got colder, the visits were moved to West Side Community House. Again, Mother was more consistent with visits, and Father less consistent. When describing Father's interaction with the children during visits, Keener testified:

> Dad has minimal interactions with the kids. He usually sits there on his phone. He will interact with them if they come over to the table that he is at, but he doesn't really play games with the children.

I understand that he is wheelchair bound, but he won't go over to them. He'll — They'll come over to him and he'll talk to them, but a lot of the times, he'll leave the visit for about a half hour to smoke a cigarette outside. So he didn't — he was there, but he wasn't fully there participating with his children, unfortunately.

(Tr. 50.)

{¶ 17} Keener described Mother's interaction with children as consistent and occurring often. However, "Mother does have a lot of anxiety. When her anxiety is high, which is often, it is harder for her to control the younger children and to get them to not be running around like animals." (Tr. 58.) Keener also testified that

Mother does tell me — whenever she does have anxiety at visits, she does bring it up to me so she can step aside. During those times, mother has told me that she has missed her medication and she just —

It's a lot. There's seven kids. And a lot of little ones that she has to watch after, and when she's not taking her medication, it makes the anxiety and her panic attacks a lot larger.

*Id.*

{¶ 18} Keener continued testifying about Mother's health, stating that Mother was diagnosed with schizophrenia, bipolar disorder, and anxiety with panic attacks. In addition, Keener has sent Mother for drug screenings, and Mother has not submitted to any of the screenings. Mother would give different excuses to Keener about why she missed her drug screenings, specifically, "[t]here was a couple of times she was sick. She also did not have her vehicle. And then sometimes she

stated that she did not get my texts or phone calls regarding the — me sending her. So there were some barriers she stated." (Tr. 62.)

{¶ 19} In addition to Mother's mental health and sobriety, there were concerns about her having stable housing for the children. Mother was referred to West Side Community House, which provides help to clients with regards to obtaining housing. Keener testified that initially Mother was going to live with Father. (Tr. 63.) However, they did not get along, and Mother moved in with a friend. Keener was not able to visit Mother's place of residence and was advised that Mother was living in a one-bedroom home with her friend. Keener stated that Mother was honest that her living situation was not appropriate for her and her children. Keener was also concerned with the fact that Mother's boyfriend was a registered sex offender, whose victim was under 13 years of age. (Tr. 64.) However, Mother told Keener that she was no longer in a relationship with the boyfriend.

{¶ 20} Keener also testified that Father's mental and physical health and lack of stable housing were an issue. Father currently lives in a nursing home and was diagnosed with depression, anxiety, and bipolar and schizo-affective disorders. (Tr. 70.) In regards to taking his medication, Father stated to Keener that "he missed several mental health appointments through MetroHealth regarding his medication. He stated he was taking his medication, but sometimes did miss them." (Tr. 70-71.) He also stated that he had missed a few doctor's appointments.

{¶ 21} Next Keener testified about the permanency plan for the children. C.V., the eldest child, was 17 years old at the time of the trial. CCDCFS decided to seek a planned permanent living arrangement for C.V. instead of permanent custody because "[h]e will graduate next year. He does not wish to be in [permanent custody] or eventually adopted. He is also working on independent living skills, which he's doing great on." (Tr. 73.) Keener also testified that she did "complete a Daniel memorial for him, which is our independent living. That's how we form our independent living plan for children. And he actually scored very well on the independent living plan, so I feel like PPLA is more beneficial for him, especially the plans he has for after school." *Id.*

{¶ 22} Keener also testified as to the current living arrangements of the children. C.V. and E.V. are living in the same foster home and have a great relationship with their foster father. (Tr. 76.) Keener does not anticipate any changes in their living arrangements. J.V. and F.V. are living in the same foster home, and Keener testified "[t]hey're doing very well. The foster parents love having them in their home. They consider them as their own and — they're doing great and they love being there." (Tr. 79.) Although J.V. was 16 years old, she did not want a planned permanent living arrangement like C.V., but rather wished to be adopted by her current foster parents. *Id.*

{¶ 23} Keener testified that I.V. and A.V. are living in the same foster home. Keener stated:

They're doing well in the foster home. Their foster mother loves [A.V.] and [I.V.]. She doesn't have many issues with them. The only times that there are issues is when they're coming home from a visit or before, because they're excited and they're wound up, so she says it takes a little bit longer to calm them down. But other than that, they are doing well.

(Tr. 82.)

{¶ 24} Keener testified that I.V. and A.V. would have to leave their foster home because their foster mother is not interested in adoption. However, J.V. and F.V.'s foster parents are interested in adopting I.V. and A.V. "because they would like to keep the children together, because they know how important it is for siblings to remain in each other's lives." (Tr. 83.) Ja.V. is placed in a foster home with other foster children. Keener stated, "He's doing exceptionally well in the foster home. He has a foster mother, as well as Auntie, he refers to her as Auntie, who is foster mother's daughter, who lives in the home." *Id.* Keener does not anticipate that Ja.V. will have to move from his current foster home if permanency was granted to CCDCFS.

{¶ 25} Keener expressed to the court that she believes that granting permanent custody to CCDCFS is in the best interest of the children because

[b]oth parents have had now over three years to get housing, work on their mental healths, work on themselves in order to work on their children and have their children back home.

Neither of them have housing right now. The children cannot go home to no home.

Father has not made any progress. Mother just recently started making progress with her housing and mental health, but it has been three years. These children need permanency.

(Tr. 88-89.)

### C.    Guardian Ad Litem Kozel's Testimony

{¶ 26} Thomas Kozel, the guardian ad litem ("GAL") for the children recommended the permanent planned living arrangement for C.V. because

> of his age, his maturity, and the likelihood of him getting a permanent connection for adoption not being very likely, that PPLA is the best course of action for him. He's very clear that he does not want to be adopted and that he just basically wants to be emancipated out and learn his independent living skills. So I do think that that's an appropriate disposition for him.

(Tr. 178.)

{¶ 27} The GAL also a recommended permanent custody to CCDCFS for the remaining children.  He expressed that

> [a]s the Court is aware, they have been in the Agency's custody for three years now.
>
> At this time, as we sit here today, neither parent is in a situation that they are able to care for these children.  Father is in a nursing home. We have no time which he is going to be able to get out.  He has no housing.  There are concerns about his mental health and some behaviors, and then his ability to self-care, take care of himself appropriately.
>
> As the testimony has shown, the Agency did make an effort to reunify with him with the assistance of the mother. Unfortunately, it didn't work.

So I do think that they deserve permanency, and that really under the law, we aren't able to give mother or father additional time in this matter.

(Tr. 178-179.)

### D.  Trial Court's Decision

{¶ 28} The trial court granted permanent custody of J.V., A.V., I.V., E.V., F.V., and Ja.V. to CCDCFS and stated in the journal entries:  "Pursuant to R.C. 2151.414, the Court finds that the allegations of the motion have been proven by clear and convincing evidence.  It is therefore ordered that the Motion to Modify Temporary Custody to Permanent Custody is hereby granted to agency."  Journal entry Nos. 0915811797, 0915811799, 0915811802, 0915811805, 0915811807, and 0915811808 (June 9, 2022).

{¶ 29} The trial court committed C.V. to the planned permanent living arrangement of CCDCFS and stated in the journal entry:  "The Court finds by clear and convincing evidence that it is in the best interest of the child to be placed in the planned permanent living arrangement, that the agency has tried or considered other possible dispositions for the child."  Journal entry No. 0915811800 (June 9, 2022).[2]

{¶ 30} Mother filed this appeal assigning two errors for our review:

---

[2] C.V.'s planned permanent living arrangement is not subject to this appeal because Mother is not appealing the trial court's decision regarding C.V.

1.    The evidence presented to the trial court did not support, by clear and convincing evidence, a finding that permanent custody to the agency was in the best interests of the six children; and

2.    The trial court erred when it denied Mother's motion for continuance of the hearing.

## II.    Permanent Custody to CCDCFS

### A.    Standard of Review

{¶ 31}  To terminate parental rights and grant permanent custody to a county agency, the record must demonstrate by clear and convincing evidence the following:    (1) the existence of one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e); and (2) permanent custody is in the best interest of the child.  *In re S.H.*, 8th Dist. Cuyahoga Nos. 97992, 97993, and 97994, 2012-Ohio-4064, ¶ 27.  "Clear and convincing evidence" is that quantum of evidence that instills in the trier of fact a firm belief or conviction as to the allegations sought to be established.  *In re Y.V.*, 8th Dist. Cuyahoga No. 96061, 2011-Ohio-2409, ¶ 13, citing *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

{¶ 32} When determining the child's best interest pursuant to R.C. 2151.414(D)(1), courts analyze the following factors:  (1) the interaction and interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and (5) whether any of the factors in divisions R.C. 2151.414(E)(7) to (11) apply.

{¶ 33} Also,

> [a] juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence "'if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence.'"

*In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

{¶ 34} The "best-interest determination" focuses on the child, not the parent. R.C. 2151.414(C); *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994). The discretion that the juvenile court enjoys in deciding whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's decision will have on the lives of the parties concerned. *Id.* at 316.

{¶ 35} Thus, we review "a trial court's determination of a child's best interest under R.C. 2151.414(D) for abuse of discretion." *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 52, citing *In re L.O.*, 8th Dist. Cuyahoga No. 101805, 2015-Ohio-1458, ¶ 22. "An abuse of discretion implies that the court's decision was unreasonable, arbitrary or unconscionable." *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 36} R.C. 2151.353(A)(4) authorizes a trial court to grant permanent custody to an agency where a child has been adjudicated neglected, dependent, or

abused. The trial court must determine by clear and convincing evidence that: (1) "the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent" pursuant to R.C. 2151.414(E); and (2) "permanent commitment is in the best interest of the child" pursuant to R.C. 2151.414(D)(1). R.C. 2151.353(A)(4).

## B.     Law and Analysis

{¶ 37} The trial court has authority to grant permanent custody to CCDCFS where, as in this case, a child has been adjudicated as neglected, dependent, or abused.

> When an agency files a permanent custody motion under R.C. 2151.413 after obtaining temporary custody, the guidelines and procedure set forth under R.C. 2151.414 apply. Division (B) of R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court. Pursuant to this division, before a trial court can terminate parental rights and grant permanent custody to a county agency, the court must find by clear and convincing evidence (1) the existence of any one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e), and (2) that granting permanent custody to the agency is in the best interest of the child.

*In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 45 (8th Dist.).

{¶ 38} "Only one of the four factors must be present for the first prong of the permanent custody analysis to be satisfied. Once the juvenile court ascertains that one of the four factors listed in R.C. 2151.414(B)(1) is present, then the court proceeds to an analysis of the child's best interest." *In re J.B.*, 8th Dist. Cuyahoga No. 98565, 2013-Ohio-1705, ¶ 80-81. Regarding the first prong of the analysis, it is supported by the fact on April 15, 2019, CCDCFS filed a complaint alleging neglect

and dependency and requested temporary custody of the children. On the same day, the court granted CCDCFS emergency custody of the children. The motion to modify temporary custody to permanent custody was filed on September 24, 2020.

{¶ 39} R.C. 2151.414(B)(1)(a) states:

(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶ 40} Also, in its journal entries, the trial court listed a number of a reasons why permanent custody should be awarded to CCDCFS, in accordance with R.C. 2151.414(E)(1) and (4). The court stated,

The Court further finds:

Following the placement of the child outside of the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

> The chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year.
>
> The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.
>
> The court finds that there is probable cause for removal of the child pursuant to R.C. 2151.31.

Journal entry Nos. 0915811797, 0915811799, 0915811802, 0915811805, 0915811807, and 0915811808 (June 9, 2022).

{¶ 41} We recognize that "a parent's right to raise a child is an essential and basic civil right." *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). And the permanent termination of parental rights has been described as "the family law equivalent of the death penalty in a criminal case." *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14. Also, "'termination of the rights of a birth parent is an alternative of last resort.'" *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21, quoting *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994), citing *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034 (1979).

{¶ 42} Mother's argument that CCDCFS did not meet its burden of proving by clear and convincing evidence that its motions for permanent custody should

have been granted is not supported by the evidence. However, we also recognize that a trial court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence "if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence." *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16. In the last three years, Mother has not demonstrated that she is able to provide adequate housing for six children. Mother has also not demonstrated that she is taking care of her mental health.

{¶ 43} The trial court stated in the journal entries:

> The Court finds that CCDCFS has made reasonable efforts to finalize the permanency plan with services that included: Case plan services for the mother and father, mother was consistent with visitation, however, was not medication complaint in regards to her mental health diagnoses. In addition, the mother is still unable to provide housing or basic needs for the child. The father has many health issues and is currently in a nursing home. Therefore, he too cannot provide a home or basic needs for the child.

Journal entry Nos. 0915811797, 0915811799, 0915811802, 0915811805, 0915811807, and 0915811808 (June 9, 2022).

{¶ 44} The GAL testified to the court that neither parent was in a situation where they could care for the children after three years of the agency's support and service referrals. As the factfinder in this case, the trial court was in the best position

to determine the credibility of the witnesses and observe their demeanor.  As we recently stated:

> "Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court."
>
> The reason for this standard of review is that the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page. * * *
>
> "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.["]
>
> "* * * A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court.  A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.  The determination of credibility of testimony and evidence must not be encroached upon by a reviewing tribunal, especially to the extent where the appellate court relies on unchallenged, excluded evidence in order to justify its reversal."
>
> This is even more crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well.  (Citations omitted.)

*In re I.S.*, 8th Dist. Cuyahoga No. 107472, 2019-Ohio-638, ¶ 68, quoting *Davis v. Flickinger*, 77 Ohio St.3d 415, 674 N.E.2d 1159 (1997).

{¶ 45} As to the second prong of the analysis, once the juvenile court determines that one of the factors listed in R.C. 2151.414(B)(1) applies, then the

court must determine, by clear and convincing evidence, whether permanent custody is in the best interest of the child. *In re E.C.*, 8th Dist. Cuyahoga No. 103968, 2016-Ohio-4870, ¶ 29. When determining the child's best interest pursuant to R.C. 2151.414(D)(1), courts analyze the following factors: (1) the interaction and interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and (5) whether any of the factors in divisions R.C. 2151.414(E)(7)-(11) apply.

{¶ 46} The trial court stated in its journal entries:

> Upon considering the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents; the age of the child; the custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or months of a consecutive twenty-two month period; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of a permanent custody; and, the report of the Guardian ad Litem, the Court finds by clear and convincing evidence that a grant of permanent custody is in the best interests of the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

Journal entry Nos. 0915811797, 0915811799, 0915811802, 0915811805, 0915811807, and 0915811808 (June 9, 2022).

{¶ 47} The trial court also stated that "reasonable efforts were made to prevent the removal of the child from his [or her] home, or to return the child to the home, and to finalize the permanency plan, to wit: reunification." *Id.* However, as

the trial court continues, "[r]elevant services provided to the family and the reason those services were not successful were case plan services but mother and father failed to substantially complete said services." *Id.*

{¶ 48} Thus, after a thorough review of the record, we find that there is clear and convincing evidence supporting the determination to award permanent custody to CCDCFS, and that the trial court did not abuse its discretion by finding that the award is in the best interest of the children.

{¶ 49} Mother's first assignment of error is overruled.

## III. Motion for Continuance

### A. Standard of Review

{¶ 50} "The decision to grant or deny a motion for a continuance rests in the sound discretion of the trial court." *In re C.W.*, 8th Dist. Cuyahoga No. 109219, 2020-Ohio-3189, ¶ 15, citing *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981). "'An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority.'" *Id.,* quoting *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. *See also State v. Acosta*, 8th Dist. Cuyahoga No. 111110, 2022-Ohio-3327, ¶ 43; *State v. Parker*, 8th Dist. Cuyahoga No. 110563, 2022-Ohio-377, ¶ 11.

### B. Law and Analysis

{¶ 51} In Mother's second assignment of error, she argues that the trial court abused its discretion when it denied her motion to for a continuance. "Not every

failure to grant a continuance violates due process 'even if the party fails to offer evidence or is compelled to defend without counsel.'" *C.W.* at ¶ 16, quoting *In re C.G.*, 9th Dist. Summit No. 26506, 2012-Ohio-5999, ¶ 9. In *Unger*, the Ohio Supreme Court noted that "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Unger* at 67.

{¶ 52} The following factors are to be considered: the length of the delay requested; whether other continuances have been requested and received, the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance, which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case. *Id.* at 67-68.

{¶ 53} In this instant case, prior to the May 31, 2022 trial date, the trial was originally set for August 25, 2021, after five previous continuances. After the August 25 trial date, the matter was continued numerous times. Mother filed for another continuance on May 23, 2022, citing communication issues with her attorney and she wanted to provide additional documentation, which she failed to bring to the hearing. However, the trial court denied Mother's motion and stated:

This matter has been continued multiple times already. These children have been in the custody of the Agency for more than three years.

I am not continuing this any longer.

Moreover, I think I had mentioned in the motion — strike that — in the Court's order denying the motion for a continuance that whatever documentation you had, you could bring it to court on today.

And apparently, you did not do that.

Moreover, you've had a sufficient amount of time to provide that documentation to counsel well before today's date. In light of the fact that this trial has been continued at least three times.

So, no, we are not going a day beyond this afternoon in terms of making a decision regarding the Agency's motion.

So that motion to continue beyond today is denied.

(Tr. 7-8.)

**{¶ 54}** Mother had over nine months to have communication with her attorney starting from the original trial date in August until May. Mother also could have submitted additional information to the court during that time. The trial court noted that the trial had been continued at least three times and that Mother had sufficient time to prepare.

**{¶ 55}** Under Juv.R. 23, "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties." Loc.R. 35(C) of the Court of Common Pleas of Cuyahoga County, Juvenile Division, further provides:

No case will be continued on the day of trial or hearing except for good cause shown, which cause was not known to the party or counsel prior to the date of trial or hearing, and provided that the party and/or

counsel have used diligence to be ready for trial and have notified or made diligent efforts to notify the opposing party or counsel as soon as he/she became aware of the necessity to request a postponement. This rule may not be waived by consent of counsel.

{¶ 56} Mother has not demonstrated that the trial court erred in denying her motion for a continuance. Therefore, Mother's second assignment of error is overruled.

{¶ 57} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, ADMINISTRATIVE JUDGE

EILEEN A. GALLAGHER, J., and
LISA B. FORBES, J., CONCUR

KEYWORDS
#111765


Abuse of discretion; permanent custody; clear and convincing evidence; motion for a continuance.

The trial court did not abuse its discretion in finding that clear and convincing evidence support granting permanent custody of the appellant's children to CCDCFS. The trial court did not abuse its discretion by denying appellant's motion for a continuance.